UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN J. ERRICO,

                                    Plaintiff,

   -against-

PFIZER CONSOLIDATED PENSION PLAN,
PFIZER CONSOLIDATED SUPPLEMENTAL
PENSION PLAN FOR UNITED STATES AND
PUERTO RICO EMPLOYEES, PFIZER SUB
PLAN, THE RETIREMENT COMMITTEE
UNDER BOTH PLANS, AND PFIZER, INC.,

                                    Defendants.

No. 19 Civ. 10211 (CM)

---

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

McMahon, District Judge:

   Plaintiff John J. Errico ("Plaintiff" or "Errico") worked for Defendant Pfizer, Inc. ("Pfizer"), from June 11, 1973 to December 31, 2007, at which point he retired and received a lump sum payout from two Pfizer pension plans – its qualified Consolidated Pension Plan ("the Plan"), which covers all employees, and its non-qualified Consolidated Supplemental Plan for the United States and Puerto Rico, Pfizer sub plan (the "Non-Qualified Plan"), which covers only senior executives. He was then rehired on July 19, 2010; he was fired on February 6, 2017 as part of a corporate reduction in force.

   This case is about the pension benefits Errico earned during the period of his reemployment with Pfizer.

1

Errico brings this suit against Pfizer, the Plan, the Non-Qualified Plan, and the Retirement Committee for these two plans (the "Retirement Committee") (collectively, "Defendants"). He asserts two claims for relief.

In his First Cause of Action, he alleges that Pfizer's Retirement Committee, which operates and administers the Plan, failed to calculate his pension benefit in accordance with the terms of the Plan, thereby depriving Errico of "benefits due" under the Plana, in violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

In his Second Cause of Action, Errico alleges that  the Summary Plan Descriptions ("SPDs") issued by Defendants failed to explain accurately how retirement benefits would be calculated for an employee who had (i) retired and taken a lump sum pension payment, and then (ii) was rehired. This allegedly violated ERISA § 102 and 29 C.F.R. § 2520.102-2. (*See* Second Am. Compl. ("SAC") ¶¶ 19-29, Dkt. No. 18; Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 1, Dkt. No. 43.)

Defendants deny that Errico's pension benefit was improperly calculated and argue that the Court must accord *Firestone* deference to the Retirement Committee's calculation, because its interpretation of the relevant provisions of the Plan was neither arbitrary nor capricious. And while they also assert that the SPDs disclosed everything needed to comply with § 102 and CFR § 2520, they argue that Errico waived his right to assert otherwise when he signed a release agreement (the "Release") and took a severance payment of nearly $100,000 at the time of his second departure from Pfizer. In addition to raising the Release as an affirmative defense, defendants bring a counterclaim against Errico for breach of the Release.

The parties have cross-moved for summary judgment. (*See* Dkt. Nos. 38, 44.)

For the reasons set forth in detail below, Errico's motion for summary judgment is denied and Defendants' cross-motion for summary judgment is granted.

## DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

Pursuant to *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Here, the parties agree, as stated in their Rule 56.1 Joint Statement of Material Facts, that the Plan confers discretion on the Retirement Committee to interpret plan terms ("Joint Facts" ¶ 20, Dkt. No. 45 (citing Plan § 2.3(a)(vi)(D)), such that the Retirement Committee's decision is afforded so-called *Firestone* deference. Therefore, this Court's review of the Retirement Committee's interpretation of the Plan is deferential, asking only if "the determination was arbitrary and capricious, *i.e.*, if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kruk v. Metro. Life Ins. Co.*, 567 F. App'x

17, 18 (2d Cir. 2014) (internal quotations and citation omitted); *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir.1995).

With these principles in mind, the Court turns to the claims.

## I.    Defendants are Entitled to Summary Judgment on Count I.

In Count I of his complaint, Errico argues that the Retirement Committee failed to calculate his benefits in accordance with the Plan's terms. He seeks "to recover benefits due" under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). (Pl.'s Mem. at 1.)

All agree that the aforementioned Release does not bar Errico from asserting this claim, because claims for ERISA benefits are specifically identified as being outside the scope of the Release.

### A.   Count I Background Facts

The facts pertinent to this claim are as follows. All factual background is contained to the administrative record and the Local Rule 56.1 statements Errico and Defendants submitted in support of their motions, and in response to their opponent's motion.

#### 1.    Errico's Employment with Pfizer

Errico joined Pfizer as a chemical engineer on June 11, 1973. On December 31, 2007, at the age of 56, Errico retired; his title at the time was Senior Director.

During his many years of employment at Pfizer, Errico participated in and accrued benefits under the Plan.[1] Under the Plan, the "Normal Retirement Date" was the first day of the month after a member attains the Normal Retirement Age (Plan § 1.28), which was age 65 (Plan § 1.27). Anyone who retired prior to the age of 65 did so on an "Early Retirement Date," which is defined

---

[1] Errico also participated in a Non-qualified Plan available to certain more senior Pfizer employees. However, none of the claims asserted in this lawsuit relates to Errico's benefits under the Non-Qualified Plan, so it will not be discussed further.

as the first day the month after a member ended active service as long as the member had either: (a) attained age 55 and completed 10 or more years of Creditable Service, or (b) attained an age that when added to his years of Creditable Service equals or exceeds 90 (Plan § 1.14). Such a person is entitled to an Early Retirement Benefit.

A member who retired on an Early Retirement Date could choose either to defer commencement of his Early Retirement Benefit until his Normal Retirement Date (*i.e.*, he could wait to start collecting his pension until he turned 65); or to start receiving benefits immediately. If an Early Retiree wished to start collecting pension benefits immediately, and his age plus  years of Creditable Service was less than 90 on the date his vesting service terminated, there was a penalty for collecting benefits at an early age: the Early Retirement Benefit was reduced by 4% per year for each year by which his Benefit Commencement Date (the first day of the first period as of which payment of a member's retirement benefit is scheduled to begin) preceded his Normal Retirement Age. (Plan § 4.2.)   However, if a member's age on the date his vesting service terminated plus his years of Creditable Service was equal to or greater than 90, the member's Early Retirement Benefit was equal his Normal Retirement Benefit, without any reduction for early commencement. (*Id.*) This is known as the "Rule of 90."

At the time of his 2007 retirement, Errico was not yet at his "Normal Retirement Age" under the terms of the Plan, which was age 65. ("Plan" § 1.27). But he had accrued 34.5833 years of Creditable Service under the terms of the Plan, so he met the "Rule of 90." As a result, he was entitled to receive his Normal Retirement Benefit as soon as he retired, rather than having either to wait until he turned 65 or to collect a reduced pension benefit.

Both Early Retirement Benefits and Normal Retirement benefits were calculated using the rule set out in §412 of the Plan, which provides as follows:[2]

> A Member who retires on his Normal Retirement Date or his Postponed Retirement Date, shall be fully vested in an annual Normal Retirement Benefit payable as a single life annuity for his lifetime equal to the greater of (a) or (b) where:
>
> (a) is 1.4% of his Final Average Earnings multiplied by his years of Creditable Service, *but in no event more than 35 years*; and
>
> (b) is 1.75% of his Final Average Earnings multiplied by his years of Creditable Service, but in no event more than 35 years; less 1.50% of his Primary Social Security Benefit multiplied by his years of Creditable Service, *but in no event more than 35 years*.

(Plan § 4.1 (emphasis added).)  Errico elected to receive his pension benefits in a lump sum, rather than take periodic payments (*i.e.*, a single life annuity). He received a lump sum of $1,729,828.04 from the Plan and a lump sum $261,858.79 from the Non-Qualified Plan.

### 2. *Retirement Benefits for Errico's Reemployment*

On July 19, 2010, Pfizer re-hired Errico to work as Director, Portfolio Operations & Systems in Medicinal Chemistry. Pfizer later promoted him to Senior Director of the unit.

Errico was entitled to accrue additional benefits for his reemployment under both the Plan and the Non-Qualified Plan, even though he had already received nearly $2 million in pension benefits. As the Non-Qualified Plan is not at issue in this case, it will not be further mentioned. I turn to his right to benefits under the Plan.

Errico's situation under the Plan was not uncomplicated. Section 5.9(a) of the Plan provides as follows:

> If a Member who is receiving Retirement Benefits or Deferred Vested Benefits is reemployed as an Employee and scheduled to work 40 or more Hours of Service in

---

[2] Technically, Early Retirement Benefits were to be calculated pursuant to Section 4.2 of the Plan, However, that section provides, "A member who retires on or after his Early Retirement Date shall be fully vested in an Early Retirement Benefit *determined in accordance with Section 4.1 as of his Early Retirement Date.*" (Plan § 4.2 (emphasis added).)

a month, payment of such Member's Retirement Benefits or Deferred Vested Benefits shall be suspended during such reemployment and any election of an optional benefit in effect thereunder shall be void. All Creditable Service earned prior to the termination of employment shall be restored and, *upon subsequent termination of employment, such Member's Retirement Benefits or Deferred Vested Benefits shall be based on Earnings and Creditable Service earned before and after (provided he is reemployed as an Eligible Employee) the date of reemployment, reduced by the Actuarial Equivalent of Retirement Benefits or Deferred Vested Benefits, as applicable, received prior to the reemployment date (and prior to Normal Retirement Age).* The Actuarial Equivalent of Retirement Benefits or Deferred Vested Benefits received prior to reemployment shall be calculated by accumulating the past payments with interest at an annual rate of seven-and-one-half percent (7.5%) compounded annually from the date or dates of receipt of said benefits to the date benefits recommence, and by converting the accumulated value of such payments to an annuity payable in the normal form based on the actuarial assumptions then in effect under Section 1.1 for determining a lump sum payable on the later Benefit Commencement Date. In no event, however, for Members reemployed after their Normal Retirement Date, shall the Retirement Benefits or Deferred Vested Benefits payable upon subsequent termination of employment be less than the benefit received prior to reemployment, increased actuarially to reflect the delayed commencement of payment, as modified to reflect any option in effect upon subsequent termination of employment. *For Members who received the benefit earned prior to reemployment in a lump sum, the Retirement Benefit or Deferred Vested Benefit payable upon subsequent termination of employment shall not be less than the Retirement Benefit or Deferred Vested Benefit calculated using only Creditable Service completed after reemployment.*

(Plan § 5.9(a) (emphasis added). "Creditable Service" is how long someone has worked for Pfizer.

(*See* Plan § 1.10.)

What this boils down to is the following: a retired employee who is rehired after receiving a pension payout from the Plan is entitled to accrue pension benefits based on his earnings and his "Creditable Service" from the period before his earlier retirement and after his date of reemployment (*i.e.*, his "total service"), less an offset for the actuarial equivalent of the pension benefits he received when he initially retired (the "offset"). As a result of the last sentence of § 5.9, someone like Errico, who previously took his pension payout as a lump sum, cannot accrue less than the benefit he earned based solely on his Creditable Service earned after reemployment (the "floor"). The idea behind this special rule is that an employee who has already taken a lump sum

from the Plan, but who is later rehired, should not have his newly-accrued pension benefits wiped out by the offset attributable to the benefits from his first period of employment.

The critical question for purposes of this lawsuit is how much Creditable Service Errico earned upon re-employment.

Errico had accrued 34.5833 years of Creditable Service as of his Early Retirement Date back in 2007. After he was rehired, Errico worked for another 6.667 years, until his job was eliminated pursuant to a reduction in force (RIF) that was implemented in February of 2017.

When the RIF occurred, Errico was over 65.[3] He thus retired for the second time on a "Postponed Retirement Date," which falls on the first day of the month after the member's active service terminates. (*See* Plan § 1.32.) In Errico's case, that date was March 1, 2017.

The Retirement Committee calculated Errico's retirement benefits for his second period of service in accordance with its interpretation of the "floor" provision in § 5.9(a). That is to say, Errico's benefits were calculated based only on the period of Creditable Service that he earned during post-2010 period of employment. However, the Committee concluded that three provisions of the Plan placed a limit on the amount of Creditable Service that Errico could earn during his second period of employment with Pfizer:

(1) Pursuant to § 3.3 of the Plan – the section on "Termination of Service" – employees like Errico who are "eligible to receive a Deferred Vested Benefit under Section 4.4, an Early Retirement Benefit under Section 4.2 or a Normal Retirement Benefit under Section 4.1" do not "forfeit all credit for Creditable Service previously credited under the Pfizer Sub-Plan." (Plan § 3.3, Admin R. 000204.)

---

[3] Errico was born on October 29, 1951 (Pl.'s Facts ¶ 1) and his Normal Retirement Date was November 1, 2016. (*See* Admin R. at 000017; Dkt. No. 45-19 at 3; *see also* Errico Dep. at 9, Dkt. No. 45-4.)

(2) Pursuant to § 5.9 of the Plan, "*All Creditable Service earned prior to the termination of employment shall be restored* and, upon subsequent termination of employment, such Member's Retirement Benefits or Deferred Vested Benefits shall be based on Earnings and Creditable Service earned before and after (provided he is reemployed as an Eligible Employee) the date of reemployment, reduced by the Actuarial Equivalent of Retirement Benefits or Deferred Vested Benefits, as applicable, received prior to the reemployment date (and prior to Normal Retirement Age)." (Plan § 5.9, Admin R. 000217 (emphasis added).)

(3) § 4.1, which provided that "in no event" could a Plan participant be credited with more than 35 years of Creditable Service, set a hard 35-year cap on the amount of Creditable Service an employee could earn.

Reading these three provisions of the Plan together, the Committee concluded that Errico started his second period of employment with 34.5833 years of Credited Service already "in the bank," as that amount of Credited Service had been restored to him upon his reemployment. In light of the hard 35-year cap, this meant that Errico earned just .4167 years of additional Creditable Service during his second period of employment – even though he worked for a total of 6.667 additional years. The resulting benefit, as calculated by the Retirement Committee when Errico's job was eliminated in the RIF, was just $22,344.81.

It bears noting that even that modest sum was more than Errico would have been entitled to receive but for the "floor" in the last sentence of §5.9. That is because, in the absence of the floor, the offset against new benefits attributable to the large lump sum payment he received when he first retired, compounded at a rate of 7.5%, would have completely wiped out any benefits based on his (admittedly brief) period of additional Creditable Service.

Errico alleges that he was so advised by hrSource, which provided administrative support for the Plan, on February 21, 2017.

### 3. Errico's Prior Notice

February 21, 2017 was not the first time Errico was explicitly told that the 35-year cap would apply to his retirement benefits.

In 2014, Errico asked hrSource – the service provider for Pfizer – to estimate what his pension benefit would be if he were to retire either at the end of 2014 or at the end of 2015. On August 5, 2014, he received hrSource's response. It showed that Errico had earned just .4167 years of Credited Service – although he had worked for Pfizer for over three years during his second period of employment – and that his lump sum pension benefit for his post-retirement employment was effectively frozen at just over $22,000, regardless of when he retired.

Errico asked hrSource for an explanation, which he received on September 3. Errico was not satisfied with the response, but instead of following up with anyone else at Pfizer, he concluded that hrSource's modeling was wrong, and continued to work. (Pl.'s Facts ¶¶ 71, 74.)

In January 2017 – just before the RIF took effect – Errico asked for another pension benefit modeling statement, this time assuming that he would retire in either March, April or May of 2017. He received that statement on January 24, 2017. It, too, showed that he had accrued just .4167 years of Creditable Service, and that his lump sum benefit was still frozen at $22,000, regardless of what month he retired. Once again, Errico protested that this could not be correct; once again, hrSource sent Errico a follow-up letter, explaining how it made its calculation. This letter was dated February 21, 2017.

### 4.    *Errico's Administrative Proceedings*

Errico, needless to say, did not see things the same way the Retirement Committee did.  He filed an administrative challenge to calculation of his retirement benefits, arguing that the 35-year cap did not apply to a reemployed individual who was entitled to the benefit of the § 5.9(a) floor.[4] Errico argued that, because the last sentence of § 5.9 stated that his benefit was to be calculated "only" with the Creditable Service that he earned from and after he was reemployed, he was entitled to benefits calculated on the basis of a full 6.667 years of work, rather than just .416667 years.

Senior Manager of Retirement Plans Lisa Marie Misertino denied Errico's claim at the first level of administrative review. After citing § 4.1 and § 5.9(a) of the Plan, and noting that the Plan provided that Creditable Service previously earned by a rehired employee was restored to that employee for purposes of calculating pension benefits, Misertino explained that the formula in § 4.1 – which had been used to calculate Errico's retirement benefits – was subject to the 35-year cap on Creditable Service (*i.e.*, service for which Errico was entitled to receive credit under the terms of the Plan):

> Since the maximum years of service to be credited under the Plan for pension calculation purpose pursuant to Section 4.1 is in no event more than 35 years, and you already received a benefit based on 34.5833 years, we cannot calculate your benefit upon rehire using all 6.6667 years but instead need to limit this period to the remainder which is .4167 years.

(Admin R. Tab 6.) Misertino rejected Errico's interpretation of the Plan – using all 6.6667 years of reemployment service – as inconsistent with the terms of the Plan. She noted that such an interpretation would allow an employee who took a lump sum retirement from Pfizer and was

---

[4] Errico also challenged the use of the 7.5% interest rate to calculate the § 5.9 offset, but that issue has been dropped from the Second Amended Complaint (*See* Pl.'s Mem. at 2 n.4.) Errico is not pursuing the Committee's denial of this aspect of his administrative challenge, so it will not be further discussed.

subsequently rehired to receive more in retirement benefits than someone who worked for the same number of years without any break in service. (*See id.*)

Errico appealed both denials to the Retirement Committee. Errico's counsel, Maria F. McKeon, submitted a letter in further support of Errico's appeal. She made the argument that Misertino had rejected and raised a litany of new arguments in support of Errico's claims.

The Retirement Committee, acting by its Secretary, Mary C. Crotty, an Assistant General Counsel at Pfizer, upheld the denial of both of Errico's claims on appeal. ("Appeal Decision," Admin. R. Tab 12, Dkt. No. 43-3.) The Retirement Committee echoed Misertino's reasoning, and particularly emphasized the inequity that would result if Errico's interpretation were accepted – *i.e.*, it would provide an unfair advantage to an employee who received a distribution under the Plan while on a break in service versus an employee who worked continuously at Pfizer prior to receiving a distribution under the Plan. (*See id.*)

B. <u>The Retirement Committee's Interpretation of the Plan Is Neither Arbitrary Nor Capricious</u>

Errico argues as follows: (1) the last sentence of § 5.9 unambiguously creates a free-standing benefit that is not subject to the 35-year cap; and (2) even if the cap applied to his situation, it would apply "only [to his] Creditable Service completed after reemployment," which does not come close to reaching the cap's 35-year limit.

The question for the Court is not whether Errico's interpretation of the Plan is reasonable. The question here is whether it was arbitrary and capricious for the Retirement Committee to interpret the Plan to apply the 35-year cap when calculating Errico's benefit "using only Creditable Service completed after reemployment." *See Kruk*, 567 F. App'x at 18, *supra*.

The answer is "no."

1.   *The Retirement Committee's Determination That Section 5.9(a) Must be Read in Conjunction with Section 4.1 Was Neither Arbitrary Nor Capricious*

Section 5.9(a) of the Plan provides, "For Members who received the benefit earned prior to reemployment in a lump sum, the Retirement Benefit or Deferred Vested Benefit payable upon subsequent termination of employment shall not be less than the Retirement Benefit or Deferred Vested Benefit calculated using *only* Creditable Service completed after reemployment." (Plan § 5.9; Admin R. at 000217 (emphasis added).)

Errico argues that the Retirement Committee's calculation was arbitrary and capricious because the 35-year cap in § 4.1 applies "*only* [to his] Creditable Service completed after reemployment" – a period that was far less than 35 years. He urges that the word "only" is unambiguous, and argues that the "only Creditable Service [he] completed after reemployment" is the full amount of time that he worked for Pfizer during his reemployment – 6.667 years --  without regard to his 34.5833 years of prior service.

The Retirement Committee agrees with Errico that the last sentence of §5.9(a) entitles him to a pension calculated "only" on the basis of the Creditable Service that he earned during his second period of employment. Where it parts company with Errico is over how much Creditable Service Errico could earn during that period. The Committee concluded that §5.9(a), rather than conferring what Errico calls a "free standing benefit," had to be read in conjunction with other terms of the Plan. I cannot say that the Committee's determination to read this sentence in conjunction with other Plan provisions was arbitrary or capricious; in fact, it appears to have been necessary, since §5.9(a) does not contain any formula for calculating the benefit it allegedly confers. Even Errico concedes as much. (Pl.'s Reply at 1-2, Dkt. No. 51.)

Because § 5.9(a) does not contain a formula for calculating retirement benefits, the Committee construed that section in conjunction with § 4.1, which sets out the actual formula for

calculating an employee's Normal Retirement Benefit when the employee retires (as Errico did in 2017) on a "Postponed Retirement Date." The calculation is made by multiplying a certain percentage of the employee's Final Average Earnings by his years of Creditable Service, "but in no event more than 35 years." (Plan § 4.1, Admin R. 000207.) Construing the words "in no event" as meaning, "under no circumstances" – even the circumstance of calculating pension benefits "only" on the basis of Creditable Service earned during his period of reemployment, per Section 5.9(a) – the Committee concluded that any service beyond 35 years did not qualify as "Creditable Service" for purposes of accruing pension benefits under the Plan.

This reading – which, as all parties agree, is entitled to *Firestone* deference – is anything but arbitrary or capricious. In fact, it is the only reading that gives meaning to all the terms of the Plan.

"As a general matter, unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning…" *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002). "It is also a cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." *Id.*

Read as the Committee did, there is no conflict between § 5.9(a) and § 4.1. The benefit floor in § 5.9(a) must be "calculated using *only* Creditable Service completed after reemployment . . . ." (Plan § 5.9 (emphasis added).) The Committee in this instance did exactly what §5.9(a) provided; it calculated Errico's pension using .4167 years of Creditable Service, which was the only period Creditable Service that Errico could complete after reemployment, given the absolute and unwaivable 35-year cap on Creditable Service contained in § 4.1. The words "in no event" are about as unambiguous as words can get. They set a ceiling on Creditable Service, even if an employee works longer than 35 years. Errico tallied more than 41 years at

Pfizer; but he, like every other person who was a member of the Plan, was permitted to accrue no more than 35 years of "Creditable Service" for pension purposes.

Errico's insistence that § 5.9(a) must be read as starting his period of Creditable Service at zero not only creates an inconsistency between §§ 4.1 and 5.9(a), it also ignores the provisions of the Plan that restore an employee's Creditable Service earned during a first period of employment when there is a break in service – not just §3.3 of the Plan, but the rest of §5.9(a) itself, which provides that a rehired employee who has already taken pension benefits from Pfizer has his previous years of service restored to him upon reemployment. Errico is effectively arguing that the Committee should have read the last sentence of §5.9(a) without regard to the rest of the section.

But there is nothing arbitrary or capricious about the Committee's conclusion that it should give meaning to all of the words in §5.9(a) – and to those in §§ 3.3 and 4.1 as well – rather than creating an exception to a provision that by its terms states that "in no event" shall an employee accrue more than 35 years of pension benefits under the Plan. The Committee's reading is the only reading that gives meaning to every relevant term of the Plan. It thus cannot be deemed arbitrary or capricious – and certainly not giving *Firestone* deference to the Committee's interpretation.

Defendants are thus entitled to summary judgment dismissing Count I.

## II.   Defendants are Entitled to Summary Judgment on Count II.

In Count II of his complaint, Errico asks the Court, acting in equity under ERISA § 502(a)(3), to grant him equitable relief for Defendants' alleged violations of ERISA's notice requirements.

Section 502(a)(3) provides that:

A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). This section "has been characterized as a 'catch-all' provision which normally is invoked only when relief is not available under § 502(a)(1)(B)," which permits plan participants to file suit to recover benefits due under the terms of the plan. *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 578 (2d Cir. 2006). Errico's Count II seeks equitable relief to enforce ERISA's notice requirements rather than any term of the Plan itself.

Claims for statutory ERISA violations are treated differently from claims for benefits under a plan. Claims under § 502(a)(1)(B) for benefits due under a plan – like Errico's Count I – must be exhausted before the Plan Administrator, and the court's review is ordinarily limited to the administrative record. Moreover, as explained above, most plan administrators are afforded great deference in their interpretation of the plan; that *Firestone* deference applies in this case.

But claims for statutory ERISA violations need not be exhausted administratively, *see Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005); *Fernandez v. Wells Fargo Bank, N.A.*, No. 12-cv-7193, 2013 WL 3465856, at *6 (S.D.N.Y. July 9, 2013). And the Second Circuit has not yet decided whether such claims are reviewed *de novo* or with deference to plan administrators' interpretations of the SPDs, *see Wilkins*, 445 F.3d at 581–82.

Errico alleges that Defendants violated ERISA's notice requirements by failing to disclose in the relevant SPDs: (a) the offset for previously received lump sum retirement benefits; (b) the 7.5% interest rate applied to calculate that offset; (c) that he "would not be entitled to a new monthly benefit that was no less than the benefit calculated using only Creditable Service completed after reemployment"; and (d) "that the benefit he earned via his second period of employment would be determined by combining his years of Creditable Service from his two periods of employment and subjecting this total to a 35-year cap." (Pl.'s Mem. at 12.)

Before reaching the merits of Errico's Count II for violation of ERISA's notice requirements, this Court must address the Defendants' affirmative defense that Errico has waived his right to bring this claim by signing the Release. "If an affirmative defense is supported by evidence from which a reasonable jury could find the defense applicable, then summary judgment must be denied." *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-cv-8459, 2018 WL 3364388, at *1 (S.D.N.Y. July 9, 2018) (citing *Celotex*, 477 U.S. at 323).

Here, Defendants' well-supported affirmative defense not only precludes granting Errico's motion for summary judgment on Count II, but also compels the Court to grant Defendants' cross motion and dismiss his equitable claim.

A.  Count II Background Facts

The following additional facts are pertinent to these inquires.

1.   *The SPDs*

The purpose of a summary plan description SPD) is to tell plan participants – in a manner that can be understood by the average plan participant – about their rights and obligations under the plan. Pfizer issued several SPDs during Errico's tenure in 2007, 2008, 2014, 2016, and 2017.[5]

One relevant section of the SPDs is entitled, "If You Return to Pfizer After Retirement" ("If You Return," for short).

At the time of Errico's initial retirement in December 2007, the April 2007 SPD was in effect. A section in that SPD entitled "If You Return" provided the following explanation of what a rehired employee could expect in the way of pension benefits:

> If you are rehired by Pfizer after you retire, work 40 or more hours a month, and
> you were receiving an annuity benefit under the Plan, your annuity benefit will be

---

[5] Defendants dispute that 2017 SPD is nowhere to be found in the record, and thus Errico cannot use it to support his claim. They also assert that this SPD was not issued under October 2017, whereas Errico states that it was effective as of January 1, 2017. (See Defs.' Response ¶ 59, Dkt. No. 35.) But there is no dispute as to the substance of the SPD.

suspended. When you retire again, your benefit (based on both periods of employment) will be reduced by the value of any payments you received, unless you repay the amount of payments you received plus interest upon rehire. However, your new monthly benefit can never be less than the amount you were entitled to at the time your annuity benefit was suspended.

If your benefits are suspended as described above, you will be provided with a Benefit Suspension Notice during the first calendar month in which your benefits are suspended. This Notice will contain a description of the Plan provisions relating to the suspension of your benefits, a copy of these provisions, a statement indicating where you can find the applicable Department of Labor regulations that discuss suspension of benefits and a description of the Plan's claims procedures.

If you are rehired by Pfizer after you have retired and received a lump-sum payment under the Plan, when you retire again, your benefit (based on both periods of employment) will be reduced by the value of the lump-sum payment you received, unless you repay that amount plus interest upon rehire. However, your new monthly benefit can never be less than the benefit calculated based on Creditable Service completed after your rehire date.

(Admin R. Tab 14 at pp. 000114-15, Dkt. No. 43-3.)

Another relevant section of the April 2007 SPD is entitled "Years of Creditable Service."

It states that "Years of Creditable Service are used in calculating the amount of your benefit *up to a maximum of 35 years*. . . . Refer to the 'Break in Service' section . . . for more details." (Admin R. Tab 14 at p. 000097 (emphasis added).)  The "Break in Service" Section states:

If your employment with Pfizer ends and you later return to work at Pfizer, your benefits may be affected by your break in service. . . .

If you have a break in service and return to work, your Vesting Service and Creditable Service before the break will be restored if you meet any of the following criteria:

• You were vested before the break in service,
• You have fewer than five consecutive one-year breaks in service, or
• You complete at least 24 consecutive months of Creditable Service after you are reemployed (in which case all prior periods of forfeited service are restored).

If you do not meet any of the above criteria, you will be treated as a newly hired employee with no prior service for all purposes under this Plan.

(Admin R. Tab 14 at p. 000099.) Employees who do not meet one of the three requirements "will be treated as a newly hired employee with no prior service for all purposes under this Plan." (*Id.*)

All of the subsequent SPDs contain substantially the same information about (i) the 35-year limitation on Creditable Service; (ii) the restoration of Creditable Service for employees returning from a break in service after more than 12 months if they were vested when they left; and (iii) the "newly hired" status for returning employees who do not meet the requirements for restoration. (*See* Dkt. No. 45-14 at 15, 16-17 (2008 SPD); Dkt. No. 45-16 at 8, 9-10 (2014 SPD); Admin R. Tab 16 at 000241, 000242-43 (2016 SPD)).  There can be no contention, therefore, that all of the SPDs disclose such the two key elements that went into the Retirement Committee's calculation of his pension benefits: the 35 year cap and the fact that his Creditable Service was restored upon rehire, so that he was not starting to accrue new Creditable Service at zero.

However, the "If You Return" section underwent some downsizing over the years. The operative SPD at the time Errico was rehired was the SPD that went into effect on January 1, 2008, just after Errico's initial retirement date.  The "If You Return" section in the 2008 SPD provides:

> If you are rehired by Pfizer after you retire, work 40 or more hours a month, and you were receiving an annuity benefit under the Plan, your annuity benefit will be suspended. If your benefits are suspended, you will be provided with a Benefit Suspension Notice during the first calendar month in which your benefits are suspended. This Notice will contain a description of the Plan provisions relating to the suspension of your benefits, a copy of these provisions, a statement indicating where you can find the applicable Department of Labor regulations that discuss suspension of benefits and a description of the Plan's claims procedures.
>
> If you are affected by this and have questions about how this impacts your individual situation, call hrSource (refer to the Resources section on page 36).

(Dkt. No. 45-15 at 5.)

The 2008 SPD was superseded by a new SPD in 2014 SPD. This SPD was in effect at or around the time Errico first asked for a modeling of his pension benefits. It added a few short paragraphs to the "If You Return" section:

> If you are rehired by Pfizer after you retire, work 40 or more hours a month, and you are receiving an annuity benefit under the PRAP, your annuity benefit will be suspended. If your benefits are suspended, you will receive a Benefit Suspension Notice during the first calendar month in Which your benefits are suspended. This Notice will contain a description of the PRAP provisions relating to the suspension of your benefits, a copy of these provisions, a statement indicating where you can find the applicable Department of Labor regulations that discuss suspension of benefits and a description of the Plan's claims procedures.

> Your retirement benefit payments will resume after you are no longer working for 40 hours or more a month. When your re-employment ends, your retirement benefit will be recalculated. Your recalculated retirement benefit will never be less than your original retirement benefit. Your prior payment form election automatically will be revoked and you will again have the opportunity to elect how you want your retirement benefit paid.

> Your benefit will be actuarially reduced to account for any payments that you may have received before re-employment.

> If you are affected by this and have questions about how this affects your individual situation, call the hrSource Center (refer to the "Resources" section).

(Dkt. No. 45-17 at 3-4.)

The 2016 and 2017 SPDs contained an "If You Return" provision that is identical to the one in the 2014 SPD. (*See* Pl.'s Facts ¶ 59.)

### 2. Errico's Communications with hrSource

Errico testified that, when he initially retired in 2007, he understood that for a "normal retirement," – by which Errico means one's initial retirement – there would be a 35-year maximum used in the computation of the benefit. (*See* Errico Dep. at 10, Dkt. No. 45-4.) So he was aware that the Plan contained a cap.

In June 2010, while in the process of applying for the rehire position at Pfizer, Errico met with a recruiter in Pfizer's human resources department. She informed him via email that, with

respect to his pension benefits, she thought Errico would be starting over as a new employee for benefits purposes, but that he should check with Fidelity, which administered the Plans for Pfizer. The next day, Errico followed up with hrSource; hrSource also told Errico that he would be treated as a new employee under the pension plan and it would take him five years to vest in the pension benefit. (Joint Facts ¶ 4.)

Errico testified that he relied on the statements from the Pfizer recruiter and hrSource in deciding to accept Pfizer's reemployment offer. In a sworn affidavit, Errico asserts, "One of the principal reasons I accepted Pfizer's offer and returned to work there was the opportunity to earn additional pension money. In this regard, I relied on the statements [the recruiter] and hrSource made to me concerning my pension rights as a re-hired employee." (Errico Aff. ¶ 16, Dkt. No. 41.)

During the appeal from the administrative denial of Errico's challenge to the calculation of his new retirement benefits, his attorney inserted the following into her letter to the Retirement Committee: "Errico was very sought after and was working as a consultant for another company when Pfizer asked him to return as a full-time employee. Had he been notified that he would work without accruing a pension benefit using all of his 6.6 years of Creditable Service, he would have accepted a position with a competitor and accrued a full retirement benefit." (Admin R. at 000058.) However, when Errico was asked in his deposition if he had any other job offers at the time he accepted reemployment with Pfizer, he responded that "no formal offers were in hand at the time." (Errico Dep. at 74, Dkt. No. 50-1.)[6]

Errico rejoined Pfizer on July 19, 2010. Approximately one year later, on July 26, 2011, Errico again asked hrSource how his pension benefit would be calculated. He emailed his notes of

---

[6] Errico slips into his brief that he "left his retirement and part-time consulting" to rejoin Pfizer. (*See* Pl.'s Mem. at 18.) But this fact does not appear in Errico's Rule 56.1 Statement of Facts, nor does he indicate where in the record – if anywhere – it can be found.

the discussion to his wife. (Joint Facts ¶ 5.) In his email, Errico wrote that – contrary to what he had been told in 2010 – hrSource told him that he was already vested under the Plan, because Pfizer was "bridging the gap" in his service. As a result, he was told that when he retired, he would receive benefits for (a) his whole service period, less the lump sum he previously received; or (b) just the rehire period – whichever is greater. (*See* Dkt. No. 45-13.) HrSource also told Errico that he could not use Pfizer's automatic pension estimator to estimate what his pension benefits would be when he next left the company, because his case was "special;" he would need to ask hrSource to calculate his benefits. (*Id.*) Errico told his wife that this was "good news" because he did not "have to do an additional service period to be vested again," and that this "[m]eans there's no particular magic to waiting 3 years." (*See* Dkt. No. 45-13.)[7]

Errico attached two documents to this email, which he described as "what [he] found when [he] was trying to see what [his] vestment period would be." (*Id.*) One of the attachments was the April 2007 SPD. (*See* Errico Dep. at 68, Dkt. No. 45-4.) Errico testified that he acquired and looked at the 2007 SPD around the time he sent the July 26, 2011 email. (*Id.* at 69-70., and further testified that he was aware, from his prior employment at Pfizer, that there was a 35-year cap on Creditable Service for pension benefits – though he believed that applied only to "normal retirement." (*Id.* at 72.)

Errico subsequently received and reviewed the 2014 SPD. He read the "If You Return" section of the 2014 SPD – which states, "Your benefit will be actuarially reduced to account for

---

[7] Pfizer accelerated the pension vesting schedule from five years to three years, effective January 1, 2011. (*See* 2008 SPD at p. 2, Dkt. No. 45-14 at 7.) In July 2011, new employees would not vest in pension benefits for 3 years. So if Errico were to be treated as a new employee, he would have been required to work for three years prior to vesting in any pension benefits. The "good news" about not being treated as a new employee was apparently that he vested immediately and did not have to work for three years.

any payments that you may have received before reemployment" – but he did not think that section applied to him, because of the last sentence of § 5.9(a). He did not think the "Break in Service" rules outlined in the 2014 SPD – which provide that his prior Creditable Service was restored upon reemployment – applied to him, either. But the record reveals no effort to obtain confirmation that his beliefs were correct by posing specific questions about the applicability of these sections to his situation. Errico simply concluded that, "Information that I had from other agents at Pfizer . . . would be the correct and accurate method of handling my particular circumstance." (*See* Errico Dep. at 95, Dkt. No. 45-4.)

Errico did, however, ask hrSource for a pension modeling statement, to see what his pension benefit would be if he retired at the end of 2014 or 2015. As explained in detail above, the statement he received on August 5, 2014, showed that the 35-year cap on Creditable Service was being applied to him, and also showed that his benefit was capped at just over $22,000. As discussed above (*infra*. p. 10), Errico dismissed the modeling statement as a mistake. (*See* Errico Aff. ¶¶ 42-43.)

In January 2017, Errico asked hrSource for another pension benefit modeling statement. By letter dated January 24, 2017, hrSource confirmed that he was entitled to a lump sum benefit of $22,344.81 – the same number that he was given back in 2014. When Errico again asked for clarification, he was sent the February 21, 2017 letter.

> ### 3.    *The Release*

What happened between the receipt of the letter dated January 24, 2017, and the letter dated February 21, 2017, gives rise to the dispute over whether Errico released the claim asserted in Count II.

In connection with his termination due to the reduction in force, on or around December 9, 2016, Pfizer offered Errico a severance payment of $95,394.43. As a condition of receiving that

payment, he was required to sign a release agreement (the "Release"). Errico was given 60 days to consider the Release and 7 days to revoke any acceptance, and was advised to consult an attorney.

Errico elected to take the money. He signed the Release on January 31, 2017. (*See* "Release," Dkt. No. 27-1.) Errico signed the Release seven days after receiving the hrSource pension statement on January 24, 2017, and three years after receiving the initial 2014 pension estimates, all of which showed that he was being credited with just .4167 years of "Creditable Service" during his period of reemployment.

The Release provides that, in exchange for the receipt of a $95,395.43 severance payment and other benefits, Errico released Pfizer from "any and all claims . . . which may be legally waived by private agreement, whether known or unknown . . . that I may have by reason of any facts or circumstances from the beginning of time through the date I have executed this Release Agreement." (Release ¶ 4.) The Release further provides:

> Further, to the extent applicable, I expressly waive any and all rights that I may have under any state or local statute, executive order, regulation, common law and/or public policy relating to unknown claims, including but not limited to South Dakota Codified Laws Section 20-7-11, North Dakota Century Code Section 9-13-02, and California Civil Code Section 1542, the latter of which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

(Release ¶ 4.)

The Release specifically extended to claims arising under ERISA. The Release does *not* extend to claims for "vested or other rights" under Pfizer's "employee benefit plans . . . that cannot be legally waived," (*id.* ¶ 7); as mentioned previously, it does bar the claim asserted in Count I

("Ans." at 12, Dkt. No. 27). But it does bar other claims arising under ERISA, including claims

under § 502(a)(3).

Paragraph 5 of the Release includes a covenant not to sue:

Except as otherwise stated below, I agree and covenant not to file any suit, complaint. charge, claim, grievance or demand for arbitration against the Company [Pfizer or any of its affiliated companies, their current and former employees, agents, representatives, officers or directors] in any court, administrative agency, commission or other forum with regard to any claim, demand, liability or obligation arising out of my employment with Pfizer or termination from employment.

(Release ¶ 5.)

Paragraph 26 of the provides that by signing the Release, Errico indicates, "that I:"

a. have carefully read and reviewed this Release Agreement;

b. fully understand all of its terms and conditions;

c. fully understand that this Release Agreement is legally binding and that by signing it I am giving up certain rights;

…

e. have been provided up to sixty (60) days to consider this Release Agreement, and agree that changes to this Release Agreement, whether material or immaterial, do not restart the running of the 60-day consideration period;

f. will have seven (7) days to revoke my acceptance after signing it;

…

i. have been advised, and have had the opportunity, to consult with an attorney prior to executing this Release Agreement;

j. execute and deliver this Release Agreement freely and voluntarily;

…

l. am not waiving any rights or claims which may arise after this Release Agreement is signed.

(Release ¶ 26.)

### 4.   The Administrative Proceedings

The Release was not mentioned during the administrative proceeding. As the Release by its terms does not apply to claims for benefits, there would have been no reason for either Misertino or the Retirement Committee to bring it up in connection with the adjudication of Errico's claims.

In his appellate submission to the Retirement Committee, Errico's attorney argued that neither the Plan *nor the SPD* capped reemployment pension benefits, and mentioned that Errico would have accepted a position with a competitor instead of Pfizer had he known he would not accrue a pension benefit using all 6.6 years of service after reemployment. (Admin R. Tab 9, Dkt. No. 42-2 at 21 to 43-3 at 3.) At the end of her letter, Attorney McKeon asserted that there would be "a significant amount of fiduciary liability if it is found that these misapplications of the plan provisions were intentional and ongoing and intentionally aimed at an older population . . . . It also appears that there are violations of ERISA, the Internal Revenue Code, the Connecticut Unfair Trade Practices Act (CUTPA), age discrimination laws, state wage laws, and state fiduciary laws." (*Id.* at 8, Dkt. No. 43-3 at 2.) She demanded that the Retirement Committee "correct these calculations so that no interest rate factor is applied and that the Creditable Service is not capped for Mr. Errico." (*Id.*)

In its Appeal Decision, the Retirement Committee addressed Errico's contention that the SPD did not cap reemployment pension benefits:

> In your appeal, you have stated that the cap on Creditable Service is not included in the sections of the SPD entitled When You Stop Accruing Benefits and If You Return to the Company After Retirement and that Mr. Errico did not receive a Suspension of Benefit Notice. The SPD includes the 35-year cap on Creditable Service under the sections How Your Benefit is Calculated and Years of Creditable Service. The section titled When You Stop Accruing Benefits is not meant to address when service accruals end, but when benefit accruals will stop. While service is capped at 35 years, participants can still receive accruals to their benefit in the form of pensionable earnings growth, which Mr. Errico did in fact receive.

Prior to his rehire at Pfizer, Mr. Errico elected to receive a lump sum distribution of his Plan benefit accrued during his first period of employment. As a result, when he was rehired in 2010 he did not receive a Benefit Suspension Notice because he was not in receipt of annuity payments that would have been required to be stopped while he was considered an active employee again. Upon his rehire, he began accruing benefits under the Plan once again and his accruals were not suspended, but were instead subject to future service (up to the 35-year cap) and earnings growth.

You have stated that upon rehire Mr. Errico was not given "any procedures advising him that his benefits would be limited upon re-employment"; however the Plan SPD containing these provisions was available to Mr. Errico both upon request to the Plan administrator as well as online for his convenience. Further, a previous SPD was available to Mr. Errico during his first period of employment and when he left the Company in 2007. As an example, the Pfizer Retirement Annuity Plan SPD in effect April 2007 contains a section titled "If You Return to Pfizer After Retirement" which clearly states that if you return to employment after receiving a lump sum your benefit is reduced by the value of the benefit previously received.

(Appeal Decision at 4, Admin R. 000073.) The Appeal Decision does not refer to the Release.

### B.  Errico Released the Claim Asserted in Count II

It is "well-established that ERISA claims are validly waived as long as the waiver is knowing and voluntary under the totality of the circumstances." *Yablon v. Stroock & Stroock & Lavan Ret. Plan & Tr.*, 98 F. App'x 55, 57 (2d Cir. 2004) (citing *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1367 (2d Cir. 1991)). Courts consider six non-exhaustive factors to determine knowledge and voluntariness:

1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Laniok*, 935 F.2d at 1368 (internal citations and alterations omitted).

### 1.  The Release Was Signed Voluntarily

All the evidence in the record supports a finding that Errico's waiver was voluntary. Errico – a well-educated Chemical Engineering with a Masters degree in Computer Science, and an experienced businessman (Joint Facts ¶ 11) – had 60 days to consider the terms of the Release, and 7 days after signing to revoke his acceptance. (*Id.* ¶ 13). He was given ample time to consult with an attorney and was advised to do so. (*Id.*) He received a $95,394 severance payment and other benefits in consideration for this release; he was not otherwise entitled to that payment. (*Id.* ¶¶ 12-13.)

Errico admits that he read the Release carefully before he signed it. (*Id.* ¶ 14.) He reviewed the last page, which told him what his signature represented before he signed it (*id.*), including that he was executing the Release freely and voluntarily; that he understood the Release was legally binding; and that by signing it, he gave up certain rights. (*See* Release ¶ 26.)

### 2. The Release Was Signed Knowingly

Errico contends that the Release is invalid because he did not sign it "knowingly" – by which he means that he had neither actual knowledge of his claim relating to the contents of the SPD at the time he signed it nor reason to know that he might have such a claim.

For multiple reasons, Errico's arguments are meritless.

First, Errico's argument rests on a faulty premise about what make a release "knowing." A release is signed "knowingly" if the person signing it is aware and understands that he is giving up certain identified rights. This particular Release by its terms identified the released rights as all of Errico's claims (other than for vested pension benefits), both "known and unknown." (*See* Release ¶ 4.) "Unknown" means "claims not known about." As long as Errico was aware that he was signing a release that barred him from bringing whatever claims he might have – whether he

28

knew about them or not – the Release was signed "knowingly." The facts set forth above indicate that Errico, a highly educated man, was fully aware of what he was doing.

To support his argument that he had to know about specific claims in order to release them, Errico relies on an excerpt from a California statute – California Civil Code Section 1542. But his reliance is misplaced, for two reasons. First, the California law plainly does not apply to Errico, a Florida resident who worked at a Pfizer facility in Connecticut. (*See* Pl.'s Facts ¶¶ 1, 3.) Second, the Release clearly states that Errico was waiving any right he might have under that particular section of the California code. (*See* Release ¶ 4, quoted *supra* at p. 23.)

Errico's cannot avoid the conclusion that he waived his SPD claim when he signed the Release by arguing, in reliance on *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 773 (2020), that he did not 'actually know" about his claim until February 21, 2017, when he received what he refers to as the "official notice" of his pension benefit.  In *Intel*, the Supreme Court held that there existed a genuine issue of fact about when the plaintiff gained "actual knowledge" of the ERISA violation that he alleged – namely, that his retirement accounts were invested in risky investments – such that ERISA's statute of limitations began running.  But we are not here discussing whether Errico's lawsuit is barred by limitations; the issue before this court is whether he released the claim he asserts. *Intel* did not discuss whether a release of all claims "known and unknown" could be a knowing release, so *Intel* is irrelevant to the issue before me.

Moreover, Errico's insistence that he did not "actually know" about his notice violation claim is demonstrably false.

Errico claims that he could not "know" about his claim because had no claim until "he suffered . . . . loss [on] February 21, 2017." (Pl.'s Reply at 5.)  But contrary to the argument Errico belatedly raised in his Reply Brief, an SPD notice violation does not accrue when benefits are

calculated or financial loss is suffered. The claim accrues, "when a plaintiff has sufficient information to allow him to understand the basis for his claim." *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 559 (S.D.N.Y. 2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017) (internal citations omitted). The record demonstrates overwhelmingly that Errico had sufficient information to allow him to understand the basis for his claim that the SPDs did not disclose how his benefit would be calculated years before he finally asserted it – and certainly by January 31, 2017, the date on which he signed the Release.

These are the undisputed facts:

Errico downloaded and reviewed the 2007, 2008, and 2014 SPDs. (Joint Facts ¶¶ 2-3.) He thus cannot claim to be ignorant of their contents.

Errico also received information from hrSource about how his specific pension benefit would be calculated under the Plan. A cursory review of the "If You Return to Pfizer After Retirement" sections of the SPDs reveals that what hrSource told him is not reflected in the SPDs that were in effect during his reemployment.

In July 2011, hrSource told him in how his benefit would be calculated, clarifying that Errico would *not* be treated as a new employee. The 2007 SPD, which he read at the time, explained in great detail what that meant in terms of restoration of his previous "Creditable Service." That Errico thought these provisions somehow did not apply to him is irrelevant. Errico also had the 2008 SPD at that time; to the extent he might have thought it was different from the 2007 SPD (although it was not different in terms of the information it provided about the 35 year cap or the restoration of prior "Creditable Service"),  Errico was in a position to ask someone about the differences in the "If You Return" sections of the two documents. He did not do so.

In August 2014, Errico asked for and received a pension benefit modeling statement. The statement plainly demonstrated that Pfizer was applying the 35-year cap on "Credited Service" to his pension benefits and showed that these benefits were frozen at just over $22,000, no matter how long he worked. Errico believed that these estimates were wrong, but chose not to follow up with hrSource or anyone at Pfizer. He had had the SPDs in his possession for years at that point, and he admits that he read them. But Errico did not file a claim at that point asserting that the disclosures in the SPDs were insufficient, even though everything he had been told indicated that that Pfizer's position about his benefits differed from his own.

Finally, on January 24, 2017 – *just seven days before he signed the Release* – Errico obtained yet another benefit modeling statement, which confirmed that his lump sum benefit was still fixed at just over $22,000. He signed the Release nonetheless and took the settlement payment he was offered.

With all of these "pieces of information at his disposal, [Errico] needn't have been an actuary to realize that his benefit had been frozen [at $22,000]. If he did not come to such an actual realization, the evidence in the record is clear that he should have." *See Osberg v. Foot Locker, Inc.*, 907 F. Supp. 2d 527, 533 (S.D.N.Y. 2012), *aff'd in part, vacated in part*, 555 F. App'x 77 (2d Cir. 2014). He thus "knew" about the facts underlying his §502(1)(3) claim at the time he elected to sign the Release and take the money.

Errico argues next that his waiver was not knowing because the Release was not "clear." He points out that, while it releases claims "known and unknown," it also states that it does not extend to claims the creditor "does not know or suspect to exist" at the time of execution or "waiv[e] any rights or claims which may arise after [the Release] is signed."

But based on the facts set out above, Errico cannot seriously contend that he did not "suspect" that he had a claim for an SPD notice violation. Indeed, Errico, through his counsel, admits that he "might have had reason to suspect that Pfizer would do what it ultimately did on February 21, 2017" at the time he signed the Release. (Pl. Reply Br. at 5). And while no Release can waive claims that have not yet accrued, the undisputed facts set out above establish that Errico's claim accrued well before he signed the Release. For these reasons, his "clarity" argument is meritless.

Finally, in a footnote, Errico argues that he would not have accepted a "mere five-figure severance" if he "knew Pfizer would be depriving him of a pension benefit worth at least $450,000," such that the amount of the pension benefit at issue far exceeds the consideration for the Release. (Pl.'s Mem. at 22 n.11.)

Arguments raised in footnotes don't count. But even if they did, this one fails on its merits. As the undisputed facts demonstrate, Errico had known for years – certainly since 2014 – that Pfizer took the position that his newly accrued pension benefits would be at just over $22,000, based on only 0.416667 years of Creditable Service. Nonetheless, he took the money he was offered in exchange for the Release. He accepted $95,394 in severance benefits in exchange for waiving any claims – even "unknown" claims – other than claims for benefits due as set forth in Count I. Errico does not contest the fact that he was not otherwise entitled to the money. His belated conclusion that he settled too cheaply neither voids nor limits the Release. *See, e.g.*, *Sullivan v. Stanadyne Corp.*, No. 13-cv-01288, 2015 WL 3674751, at *4 (D. Conn. June 12, 2015).

### 3.  The Release Covers the Claim Asserted in Count Two

Finally, Errico contends (albeit for the first time in his Reply Brief) that the Release does not apply to his SPD claim because it does not cover that claim, which did not "arise" until he was

32

"damaged" – which, he contends, did not occur until Pfizer gave him definitive word about what his pension benefit would be after his termination in February 2017. He argues that he "had no claim . . . until he received hrSource's February 21, 2017 letter" explaining the calculation of his benefits after he had signed the Release Agreement. (Pl.'s Reply at 5–6, Dkt. No. 51.)

Whether a release encompasses particular claims presents an entirely separate issue from whether the release is knowing and voluntary. *Frommert v. Conkright*, 535 F.3d 111, 122 (2d Cir. 2008) *rev'd and remanded*, 559 U.S. 506 (2010) (on other grounds) [hereinafter *Frommert II*]. In *Frommert II*, the Second Circuit reversed a district court's determination that a waiver was not enforceable because it was ambiguous as to whether or not several plaintiffs had waived their ERISA claims. 535 F.3d at 121. The Second Circuit noted that the "District Court appears to have conflated the existence of consideration adequate to render a release enforceable" – the sixth *Laniok* factor – "with the scope of claims thereby released." *Id.* at 122.

Although as a general rule, "'a court should not consider arguments that are raised for the first time in a reply brief.'" *Aviva Trucking Special Lines v. Ashe*, 400 F. Supp. 3d 76, 80 (S.D.N.Y. 2019) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006) (Sotomayor, J.)), this court will consider Errico's argument – if only to avoid making a *Frommert* mistake.

Errico is wrong as a matter of law. As the District Court for the District of Columbia held, in an ERISA breach of fiduciary duty case raising similar release issues, "[his] interpretation of 'arisen' would render nugatory the portion of the contract that purports to release 'unknown,' 'unsuspected,' and 'contingent' claims of any kind." *Russell v. Harman International Industries, Inc.*, 945 F. Supp. 2d 68, 71 (D.D.C. 2013), *aff'd*, 773 F.3d 253 (D.C. Cir. 2014).

In *Russell*, the plaintiff was a former Harman employee whose employee pension benefit plan (the "Plan") had been invested in Harman's common stock. Russell signed a severance

agreement on June 19, 2007 that released Harman and its affiliates from any claim "which have arisen on or before [June 19, 2007] . . . whether now known or unknown, suspected or unsuspected and whether or not concealed or hidden, fixed or contingent," including ERISA claims. *See Russell, supra.,* 954 F. Supp. 2d at 72. Russell alleged that Harman made materially false and misleading statements about Harman's financial conditions in April 2007, which caused a significant drop in the price of Harman common stock in January 2008. *See id.* at 78. He brought ERISA claims against Harman and its various administrative, investment, and pension committees for breach of fiduciary duty for failing to disclose complete and accurate financial information about Harman, which allowed Plan members to invest in Harman common stock despite the company's poor financial condition. *See id.* at 71.

The parties disagreed about whether Russell's ERISA claim "arose" before June 19, 2007, and so, was barred by virtue of the severance agreement. Russell, like Errico, argued that his claims did not accrue until he was injured by the misstatements, which did not occur until the stock price fell. Both the district court and the Court of Appeals disagreed, concluding that the claim arose when the misstatements were made and the fiduciary duty to disclose accurately was allegedly breached.

Errico's position on his inapplicability argument is even weaker that Russell's, because the undisputed facts establish overwhelmingly that Errico knew well before he signed the Release that he was going to suffer the injury that was eventually worked when he got his pension benefit. Defendants had been telling him for years that his pension benefit was going to be capped at just over $22,000; it was not a surprise to him, as the fall in Harman's stock price may well have been to Russell. For all of the same reasons discussed above, at the time Errico signed the Release, he had more than enough information to put him on notice of the basis of his claim that the SPDs did

not afford adequate disclosure at the time he signed the Release.  *See Sullivan*, 2015 WL 3674751,

at *6; *see also Anderson v. Xerox Corp.*, 29 F. Supp. 3d 323, 331 (W.D.N.Y. 2014), *aff'd*, 614 F.

App'x 38 (2d Cir. 2015).

     C.  <u>Defendants Did Not Waive the Release Defense</u>

     The real question in this lawsuit is not whether the Release bars Errico's SPD claim, but

whether Defendants waived the right to use the Release against Errico because the Retirement

Committee did not raise it in the underlying administrative process.

     Both parties cite to the Second Circuit's decision in *Lauder v. First UNUM Life Insurance

Co.*, 284 F.3d 375 (2d Cir. 2002) – Plaintiffs for the assertion that "failure to raise the Release

Agreement 'below' waives the ability to raise it now," (Pl.'s Mem. at 25); Defendants for the

assertion that "there could be no knowing and voluntary waiver of this defense by the Retirement

Committee since the Retirement Committee was unaware of the existence of this Release," nor did

it have "any reason to investigate this issue," (Defs.' Mem. at 20-21). Neither side is entirely

correct in its reliance on *Lauder*.

     In *Lauder*, the Second Circuit held that whether waiver applies to an ERISA claim for

insurance benefits requires courts to "conduct a case-specific analysis" as to whether "waiver

applies in the particular situation presented by this ERISA case." 284 F.3d at 381.

     The panel's reasoning began with "the law applicable to insurance policies [that] an insurer

may be barred from raising defenses not asserted in communications to the insured denying

coverage." *Id.* at 380 (quoting *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279,

288 (2d Cir. 2000) (citing *State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir.

1991))). The panel discussed *Juliano*, in which the Second Circuit had held that an HMO did not

waive the defense of medical necessity to the plaintiff's ERISA claim, even though it failed to

raise medical necessity as a ground for denial of the insured plaintiff's claim. *See id.* at 380–81.

The *Juliano* court concluded first that medical necessity was not a waivable defense because the Plan only covered "medically necessary" care, and waiver cannot be used to expand the scope of insurance coverage beyond what is provided by the policy. It also concluded that extending the insurance law waiver doctrine to ERISA claims could turn ERISA notices into "meaningless catalogs of every conceivable reason that the cost in question might not be reimbursable, instead of candid statements as to why the administrator . . . thinks reimbursement is unwarranted." *Ibid.* (omission original) (quoting *Juliano*, 221 F.3d at 288).

In *Lauder*, the Circuit concluded that nothing in *Juliano* prevented the application of the waiver doctrine to Lauder's case. That being so, the governing principle was not *Juliano* itself, but *AMRO Realty*. There, the Circuit held that, "an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *Id.* at 382 (quoting *AMRO Realty Corp.*, 936 F.2d at 1431).

The Second Circuit also noted its "concern that plan administrators . . . will try the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail." *Id.* The court refused to endorse such "manipulative strategies," and noted that "'candid' statements by the insurer should be encouraged." *Id.* (quoting *Juliano*, 221 F.3d at 288).

In the end, the *Lauder* court, like the *Juliano* court before it, did not "create a federal common law doctrine of waiver in the ERISA context," and expressly "limit[ed] [its] holding to the circumstances of this particular claim." *Id.*

Courts in this Circuit look to *Lauder*'s "case-specific analysis" to determine whether waiver applies in ERISA claims for pension benefits as well. Following the principles outlined

therein: (1) a court should not find waiver if it would either (a) expand the scope of coverage permitted under the plan, *e.g.*, by waiving an element required for coverage; or (b) risk turning ERISA notices into "meaningless catalogs" of reasons for denial; (2) if neither of those concerns apply, a court may deem a defense waived if (a) the plan administrator intended to waive a defense to coverage where other defenses are asserted, and (b) the plan administrator possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense; and (3) if so, consider why the administrator chose not the rely on the defense as a reason for denial in the administrative proceeding – including whether the plan administrator may have tried "the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail." *See Lauder*, 284 F.3d at 382; *see also Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 318 (S.D.N.Y. 2003).

If it were appropriate to apply *Lauder*'s analysis to this case, Errico might have an argument. Applying waiver to the release of an ERISA notice claim would not expand the scope of the plan. Granting Errico relief for the alleged violation claim would not alter the terms of the Plan; relief would be predicated on how that Plan is described in the SPDs. Neither the Release nor its waiver would affect the benefits to which Errico is entitled under the Plan, or expand "coverage" under the Plan. And if the court were to conclude that the Committee waived the right to invoke the Release, it would not turn Retirement Committee's claim denials into "meaningless catalogs" of defenses.[8]

---

[8] Of course, there is no evidence in the administrative record that the members of the Retirement Committee actually knew about the Release --  Errico certainly did not bring it to the Committee's attention -- but it was Pfizer's job, not Errico's,  to make sure the Retirement Committee was well informed about the personnel record of a claimant. Even if the members of the Retirement Committee did not know that Errico had signed a Release in connection with his termination pursuant to a reduction in force, they arguably should have so known; such releases are commonplace when reductions in force are implemented.

But the defense of Release was not applicable to the claim Errico was pressing administratively. Therefore, the Retirement Committee had no reason whatsoever to assert the Release as a defense in the administrative proceedings. The Committee was not adjudicating an inadequate notice claim. arising under §502(a)(3). The Committee had no power to adjudicate such a claim. Errico's claim before the Retirement Committee was a claim for benefits due under the Plan, not a claim for equitable reformation of the SPDs, as asserted in Count II. The Release by its terms did not apply to Errico's claim "vested or other rights" under Pfizer's "employee benefit plans," which is what the Committee was adjudicating. There was, therefore, no reason for the Committee to bring up the Release, or for Pfizer to assert in the administrative proceedings that Errico had released claims other than the claim that was properly before the Committee, and the Committee's failure to do so cannot be deemed a waiver of the defense.

Errico argues that he brought his SPD notice violation claims to the Committee during his appeal, and contends that the Committee "rule[d] on them – on their merits." (*See* Pl.'s Opp'n at 7.) But it is not correct that the Committee "ruled" on Errico's SPD claim, because Errico's notice violation claim was not before the Retirement Committee. The only issue before it was his claim for benefits under the Plan. Defendants acknowledge that Errico's lawyer made statements in her appeal letter about the contents of "the applicable SPDs," but assert that the Committee addressed those statements only in aid of the Committee's interpretation of Plan provisions – not to "rule" on an SPD notice claim. (*See* Defs.' Opp'n at 13.) Since a similar, if not identical, argument applies to both the claim for benefits and the claim that the SPDs failed to disclose how benefits would be calculated, that is hardly surprising.

The administrative record reflects that the Retirement Committee responded to some of Errico's objections to the SPDs. But responding to statements made by a lawyer about matters

extraneous to the claim at hand does not convert those matters into a *claim* that could be adjudicated by the Retirement Committee, as to which Pfizer was required to assert *defenses*. The statements made by the Committee about the SPDs were plainly part of its effort to explain why the Committee interpreted the Plan as it did, and did not constitute any sort of "ruling" on a claim as to which Pfizer or the Committee were required to assert defenses such as waiver.

Moreover, while Errico's lawyer alluded to a litany of potential claims that could be brought only in a court of law, she ultimately asked the Retirement Committee to do just one thing – recalculate the benefit Errico was due under the terms of the Plan. That is the only thing the Committee had the power to do.  Errico's § 502(a)(3) claim is a claim in equity, and courts sit in equity; retirement committees do not. ERISA requires that plans provide claims procedures for a full and fair review of "claims for *benefits* by participants and beneficiaries" – not claims for equitable relief arising out of other alleged statutory violation. *See* 29 CFR § 2560.503-1(a) (emphasis added). Errico (and McKeon) asked the Retirement Committee for additional benefits under the terms of the Plan, not for equitable relief resulting from a notice violation. As the Release by its terms does not cover claims for benefits, one would hardly expect the Retirement Committee to assert it as a defense in the administrative proceeding.

The parties have not cited any case in which a court applied *Lauder*'s waiver doctrine to a notice violation claim, nor is this Court aware of any such case. It seems unlikely that such a claim would ever fall within the purview of a plan's administrative review process. The facts that there is no exhaustion requirement for notice violation claims, *see Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005); *Fernandez v. Wells Fargo Bank, N.A.*, No. 12-cv-7193, 2013 WL 3465856, at *6 (S.D.N.Y. July 9, 2013), and that courts afford "plan administrators no deference" when judging a plan administrator's compliance with the applicable statute and regulations, *see*

*Wilkins*, 445 F.3d at 582, reinforce the concept that ERISA notice violation claims are for courts, not retirement committees.

After considering the facts and circumstances surrounding the Retirement Committee's denial of Errico's claims, I conclude that the Retirement Committee did not waive its defense with respect to the Release. Accordingly, Count II of Errico's complaint is barred by virtue of the Release.

Defendants are entitled to summary judgment dismissing Count I.

## III.    Defendants are Entitled to Summary Judgment on Their Counterclaim

In their counterclaim, Defendants allege that Errico breached the covenant not to sue in the Release. Errico did not specifically address Defendants' counterclaim in his papers.

In order to make out a colorable breach of contract claim, a plaintiff must show: (1) an agreement; (2) adequate performance by plaintiff; (3) breach by the defendant; and (4) damages. *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09-cv-5580, 2014 WL 5861984, at *6 (S.D.N.Y. Nov. 10, 2014) (citing *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).

Here, Errico and Pfizer were parties to the Release. Pfizer fulfilled its obligation by paying Errico the promised $95,394.43 severance. (*See* Pl.'s Facts ¶¶ 62-63.) The Release included an unambiguous covenant not to sue: Errico "agree[d] and covenant[ed] not to file any suit, complaint, charge, claim, grievance or demand for arbitration against the Company in any court, administrative agency, commission or other forum with regard to any claim, demand, liability or obligation arising out of [his] employment with Pfizer or termination from employment." (Release ¶ 5.) As noted above, the Release does not extend to Errico's claims for vested benefits under the Plan. However, Errico breached this covenant by bringing his Count II for ERISA notice violations against Defendants.

With respect to damages, Defendants assert that Errico's breach caused them direct harm, "including necessitating the deposition of Mr. Errico and expending additional attorney time and costs defending against this notice claim." (*See* Defs.' Mem. at 25.) But Defendants have not introduced any evidence to support this claim. Additionally, "The Second Circuit, in its interpretation of New York law, prevents parties from recovering damages in the form of attorney's fees for a good faith violation of a covenant not to sue, unless there exists clear contractual language providing for attorneys' fees." *Reach Music*, 2014 WL 5861984, at *8. Here, the Release does not provide for attorneys' fees.

Nevertheless, Defendants were "at least nominally damaged by [Errico's] failure to comply with his contractual obligations; to find otherwise would render the covenant not to sue meaningless." *See id.* Accordingly, Defendants are entitled to summary judgment on their counterclaim and to damages in the amount of $1.

**CONCLUSION**

For the reasons stated above, Errico's motion for summary judgment is DENIED. Defendants' cross motion for summary judgment is GRANTED.

This constitutes a written opinion and order of the Court. The Clerk of Court is directed to market the motions at Docket #s 38 and 44 off the Court's list of open motions, to enter judgment for Defendants, and to close this case.

Dated: April 20, 2021
      New York, New York

_____
District Judge

BY ECF TO ALL PARTIES